2020 IL App (2d) 180424-U
No. 2-18-0424
Order filed February 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-2839 |
| RONALD A. MILLER, | ) ) ) | Honorable Joseph G. McGraw, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Zenoff and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:    In defendant's appeal of his convictions for sex offenses against a child, G.M., defendant forfeited his contention that his trial counsel was ineffective for failing to make a pretrial challenge to G.M.'s competency as a witness. Also, the record was not adequately developed to evaluate defendant's claim that his trial counsel was also ineffective for failing to call an expert to rebut the State's expert testimony that G.M. was sexually abused. Lastly, the evidence was sufficient to support defendant's convictions.

¶ 2    Defendant, Ronald Miller, appeals his convictions for predatory criminal sexual assault of a child and aggravated criminal sexual abuse. He argues: (1) his trial attorney provided ineffective assistance of counsel for failing to make a pretrial challenge to the competency of the victim, G.M.,

as a witness, and for failing to retain an expert witness at trial; and (2) the evidence was insufficient to support his convictions. We reject these contentions and affirm defendant's convictions.

¶ 3                                    I. BACKGROUND

¶ 4       In January 2016, defendant was charged in a three-count indictment. Counts 1 and 2 each charged predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)), in that defendant, who was 17 years or older at the time of offense, knowingly committed an act of sexual penetration with G.M., who was under 13 years of age at the time of the offense. Count 1 alleged that defendant placed his finger on the vagina of G.M., while count 2 alleged that defendant placed his penis on the anus of G.M. Count 3 charged aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2016)), in that defendant, a family member, knowingly committed an act of sexual conduct with G.M. by placing G.M.'s hand on his penis for the purpose of sexual arousal and gratification and G.M. was under 18 years of age at the time of the offense. The offenses were alleged to have occurred between December 1, 2014, and July 18, 2015. G.M., who is defendant's biological daughter, was born on February 11, 2010.

¶ 5       Prior to trial, the State filed a motion, pursuant to section 115-10 of the Code of Criminal Procedure (725 ILCS 5/115-10 (West 2016)) to introduce at trial the hearsay statements of G.M. through the testimony of her mother, Lori Johnson, and through the video recording of an interview between G.M. and child abuse investigator Marisol Tischman in August 2015. Defense counsel argued for exclusion of G.M.'s prior statements because they were inconsistent and "bizarre."

¶ 6       The trial court granted the State's motion and ruled that the statements were admissible. In providing the grounds for its ruling, the court remarked that, if the State intended to call G.M. as a witness, the court would "of course" conduct a *voir dire* examination of G.M. outside the presence of the jury in order to determine her competency to testify.

¶ 7 A jury trial was held on October 10 and 11, 2017. Following jury selection, the State affirmed that it intended to call G.M. as a witness. Upon learning that G.M. was seven years old, the trial court asked whether the defense had filed a motion challenging G.M.'s competency to testify. The State replied that the defense had filed no such motion. Defense counsel made no comment, and the parties proceeded with their opening statements. In the defense's opening statement, counsel asserted that G.M.'s account changed over time and had "outlandish" aspects.

¶ 8 The State's witnesses at trial were G.M., Johnson, Tischman, Dr. Sharon Rhodes, and Shannon Krueger.

¶ 9 The State began its examination of G.M. by testing whether she knew the difference between the truth and a lie. G.M.'s answers suggested that she understood the difference.

¶ 10 G.M. testified that she is seven years old and is in the second grade. Her mother is Lori Johnson. She identified defendant in court as her father, "Ronnie," but she could not recall his last name. G.M. testified that she knew what parts of her body people should not touch. She pointed to two such areas: her chest, which she called her "boob," and her private area, which she called her "coo-coo." According to G.M., it was when defendant "touched her privates" that she first learned that there were areas on her body that people should not touch. She was four or five years old when defendant touched her "coo-coo" with his finger. The touching occurred in the bathroom of the home where defendant lived with his parents. At the time defendant touched her, G.M. was wearing a shirt but her pants and underwear were down. G.M. could not recall if defendant's finger was inside or outside her "coo-coo." The touching "hurted [*sic*] a little bit but not too much, like getting your ears pierced." G.M. initially testified that she thought defendant "touched [her] two times more," but later she claimed that she did not recall defendant touching her "coo-coo"

3

with his fingers at other times. She also testified that defendant did not touch any other private part of her body that he was not supposed to touch. She did not recall seeing defendant's "private."

¶ 11    G.M. remembered talking to Johnson about what happened, but she did not recall what date they talked. She also did not recall telling Johnson any of the following: (1) defendant "wipes [her] without paper"; (2) defendant "licks his fingers and then washes his hands after doing that"; (3) defendant is "weird" because he "runs his finger up and down [her] vagina all the way to [her] butt"; (4) defendant "would hold [her] arms behind [her] back and touch [her]"; (5) defendant "would tie [her] up with gray tape"; and (6) defendant "didn't touch [her] and that [she] only said it because [she] [was] mad at [Johnson]."

¶ 12    G.M. recalled speaking with Tischman about defendant at the Carrie Lynn Children's Center (CLCC), but G.M. could not recall the date. She also did not recall telling Tischman any of the following: (1) defendant "would touch [her] in the shower"; (2) defendant "showed [her] his coo-coo"; (3) defendant "made [her] touch his coo-coo"; (4) defendant "got [her] naked and let [her] get into the shower"; (5) defendant "touched [her] coo-coo in the shower"; and (6) defendant "was in the shower with [her] naked."

¶ 13    G.M. recalled speaking to Tischman about Dexter, a dog who lived in her grandparents' home. However, G.M. did not recall telling Tischman that defendant brought Dexter into the bathroom while defendant was hurting G.M. and that Dexter pooped all over her. G.M. also did not recall telling Tischman that defendant touched her in front of her Aunt Debbie, who then called the police. G.M. did recall, however, telling Tischman that the police "gave [defendant] one more chance." G.M. also recalled telling Tischman that she told defendant to stop, but she did not recall telling Tischman that she yelled "stop" so loud that it broke her ear drum. G.M. also did not recall

telling Tischman that defendant had a cast, that he called 911 on her, or that defendant got arrested, broke out of jail, and never got caught again.

¶ 14    G.M. testified that she has met with "Jenny," *i.e.*, Assistant State's Attorney (ASA) Jennifer Clifford, at her office about "sixteen" times, or at least "a lot" of times. A woman named Linda was also there for the meetings. G.M. remembered telling Clifford in June (four months before trial) that defendant "touched [her] private when he was putting medicine on [her]." She also remembered telling Clifford in July (three months before trial) that defendant never helped her in the shower and that she never touched defendant's penis or even saw it.

¶ 15    G.M. testified that she loved defendant, missed him, and wanted to spend time with him.

¶ 16    Johnson testified that she currently lives with G.M. and T.G., who is Johnson's 16-year-old son by another father. Johnson dated defendant for four or five years and lived with him for two years. Defendant moved out while Johnson was pregnant with G.M. Since G.M. was born, defendant has resided with his mother and stepfather, the Stonewalls, whom G.M. calls "Mima and Opa." After defendant moved out, he and Johnson had an "on-again-off-again" relationship for the next several years. Johnson, defendant, and G.M. would spend time together, such as for dinners, movies, and trips. The three of them also spent time with defendant's family. Johnson and defendant's sporadic relationship ended around 2012, but they thereafter remained mostly civil to each other. Johnson continued to have a good relationship with defendant's family, who remained supportive of her.

¶ 17    Johnson explained that, before and during July 2015, she and defendant had an arrangement regarding the care of G.M. on weekdays. During that period, Johnson worked first shift and defendant worked second shift. On weekdays, Johnson would take G.M. to the Stonewalls' home before she went to work. Defendant would watch G.M. at the Stonewalls' home until he needed

to leave for work, at which point he would take G.M. to the home of one of his sisters, Debbie Cannon or Renee Bennick. When Johnson finished work, she would pick up G.M. at the sister's home.

¶ 18    Johnson testified that, in 2012, she and defendant quarreled over the weekday care for G.M. Defendant had begun to complain about having to watch G.M. Johnson responded by finding a sitter to replace defendant. This action prompted defendant to seek relief in court. As a result, the foregoing care arrangement became formalized.

¶ 19    Johnson testified that G.M. first made an accusation against defendant on July 16, 2015. On the weekend before July 16, Johnson had a telephone conversation with defendant in which he became upset about Johnson's plan to enroll G.M. in school in the fall.

¶ 20    Johnson recounted that, on July 16, she gave G.M. a bath. Afterwards, Johnson left G.M. to dry off and get dressed while Johnson went downstairs to clean. G.M. came downstairs wearing her towel and asked for help in putting her pajamas on. G.M. sat on the carpet and spread her legs open in a butterfly position. She asked Johnson if she looked red. Because of G.M.'s posture, Johnson knew she was referring to her privates. Johnson replied that G.M. did not look different than usual. G.M. then stated, " 'My dad has been touching me.' " Johnson replied that defendant was just helping G.M. wipe. G.M. said, " 'Yes,' " followed by, " 'But without toilet paper.' " G.M. also said that defendant "licks his fingers and washes his hands." Johnson asked G.M. how many times defendant did this to her. G.M. spread both hands and held them up. Johnson took this to mean that defendant did it more than once. While making these statements, G.M. was very calm and acted "a little more grown up than normal." Johnson asked G.M. no more questions and put her to bed. Johnson testified that she had no suspicions prior to July 2015 that defendant was acting improperly with G.M.

¶ 21     Johnson testified that, on the morning after G.M.'s accusation, she did not take G.M. to the Stonewalls' home per the care arrangement.  Instead, Johnson took G.M. to the home of one of Johnson's cousins.  Johnson did not call the police or the Department of Children and Family Services (DCFS), but instead made an appointment with G.M.'s physician, Dr. Rhodes, for July 18.  In the evening after the visit with Rhodes, G.M. was taking a bath when she made the impromptu remark that defendant runs his finger from her "pee-pee" to her butt and that this was "weird."  Johnson explained that "pee-pee" was the word she and G.M. used for vagina.  G.M. never used the word "coo-coo" to refer to her private area.  Johnson did not follow up with any questions.  A couple of days later, G.M. made the further impromptu remark that defendant held her hands behind her back and touched her "pee-pee."  G.M. said that defendant told her, " 'I'm going to touch you every day and don't tell the mamas.' "  "Mamas" was a term that defendant used with G.M. in referring to Johnson.  At some other point, G.M. told Johnson that defendant would tie her up with grey tape.

¶ 22     Johnson further testified that, sometime between July 18, 2015, and October 17, 2016, G.M. told her that defendant "didn't do this."   G.M. said, " 'Daddy didn't touch me.  I was mad at you so I said it.' "

¶ 23     According to Johnson, Dr. Rhodes contacted DCFS after seeing G.M.  DCFS then told Johnson that she would have to get a restraining order against defendant if she wanted to retain custody of G.M.  On August 6, 2015, Johnson took G.M. to the CLCC to be interviewed.

¶ 24     Johnson noted that G.M. has suffered from constipation since she was a baby and was prescribed a laxative.  G.M. has also had urinary tract infections, which were treated with an oral antibiotic, and frequent problems with redness, which were treated with a topical cream.

¶ 25    Tischman testified that, from 2003 to 2016, she was a forensic investigator with the CLCC. During those years, she conducted forensic interviews with over 2,500 children. The State introduced into evidence a DVD recording of Tischman's interview with G.M. from August 6, 2015. The State also introduced anatomical drawings that Tischman used in order to confirm the meaning of terms that G.M. employed during the interview. Tischman confirmed that G.M. referred to her vagina as her "coo-coo" and referred to defendant's penis as his "coo-coo" or "wiener." Tischman testified that she had to "refocus" G.M. at times during the interview in order to keep her from going down tangents.

¶ 26    The State played the DVD for the jury. The recording depicts Tischman and G.M. in an interview room. As Tischman is explaining that her job involves asking children questions, G.M. volunteers that "her Daddy" has been touching her "coo-coo." G.M. states that defendant touched her "coo-coo" many times. Tischman asks G.M. to describe specific incidents. G.M. then describes one incident that occurred at her "Mi Ma's house," *i.e.*, the Stonewalls' home, when she was alone with G.M. Defendant took her in the bathroom. He took her clothes off and then he took his clothes off. They went into the shower together and washed. Defendant touched her "coo-coo" with his finger. His finger went inside her "coo-coo." After he came out of the shower, defendant took G.M.'s hand and placed it on his "coo-coo" or "wiener." Defendant threatened to spank G.M. if she did not touch his "coo-coo."

¶ 27    Tischman then asks G.M. what defendant's "coo-coo" looked like, and G.M. takes several crayons and holds them together. G.M. states that defendant's "coo-coo" was like the crayons except that it was softer like G.M.'s skin and was brown on the side. G.M. further states that, while they were in the bathroom, defendant brought in a dog, Dexter, who was living in the home.

Dexter "pooped all over" G.M. G.M. claims that she was five years old when this incident occurred. G.M. states that she has taken a shower with defendant on other occasions.

¶ 28 G.M. also describes an incident that occurred at her Aunt Debbie's home. G.M. was on the toilet when defendant began touching her "coo-coo" with his finger. His finger went inside her "coo-coo." G.M. yelled at defendant to stop. She yelled so loudly that it broke defendant's eardrum and now he has to wear a cast. Aunt Debbie saw defendant touching G.M. and called the police. When the police came, they decided to give defendant one more chance. G.M. states that she was four or five years old when this incident occurred.

¶ 29 G.M. claims that another instance of touching occurred at her Aunt "Nay Nay's (Renee) home. G.M. was in the bathroom when defendant took off her pants and touched her "coo- coo" with his finger. G.M. was five years old when this happened.

¶ 30 G.M. further claims that defendant placed his "wiener" between her butt cheeks. G.M. does not say when or where this happened.

¶ 31 G.M. makes several additional claims during the interview: (1) her "grandma" threatened to call the police if defendant touched G.M. again; (2) defendant was arrested, broke out of jail, and never got caught again; and (3) defendant called 911 on G.M. so that he could keep touching her.

¶ 32 Rhodes testified that she has been G.M.'s pediatrician since her infancy. Rhodes saw G.M. on July 18, 2015, at Johnson's request because G.M. had reported that defendant touched her inappropriately. G.M. told Rhodes that she normally went to the bathroom by herself, but when she was at defendant's home, he went into the bathroom with her. When she was done on the toilet, defendant would touch her private area with his hand. He did not use toilet paper in touching G.M. On some of these occasions, defendant's hand went inside G.M. After he touched her, he

would wash his hands and lick his fingers. G.M. reported that defendant touched her in this manner " 'a lot' " and that the touching hurt her.

¶ 33 Rhodes testified that, during the time that G.M. was her patient, Rhodes would see her for annual exams and occasional sick visits. Defendant was present for some of these appointments. Defendant's behavior toward G.M. was appropriate on these occasions and raised no concerns with Rhodes. Rhodes had no suspicion prior to July 18, 2015, that G.M. was being sexually abused. Rhodes also saw nothing unusual about G.M.'s demeanor on July 18.

¶ 34 The State introduced into evidence G.M.'s medical records from February 2010 to December 2015. Rhodes noted that G.M. occasionally reported redness or irritation in her private area or complained about pain when urinating. Rhodes' practice was to examine G.M.'s private area if she reported pain there, but Rhodes was unsure if her partner physicians who saw G.M. followed the same practice.

¶ 35 According to Rhodes, pain upon urination and blood in the urine can be symptoms of a urinary tract infection (UTI). In children five years old or younger, UTIs are commonly caused by hygiene issues such as not wiping properly or sitting in wet clothing for a prolonged period. Some children, however, are more congenitally disposed than others to UTIs. G.M. was diagnosed with a UTI once or twice. Rhodes prescribes an oral antibiotic for a child of G.M.'s age who has an UTI.

¶ 36 Rhodes noted that redness or irritation in the private area can, like UTIs, be caused by hygiene issues such as inadequate wiping or cleaning, wiping too hard, or sitting in wet clothing for a prolonged period. Diaper cream can usually treat redness and irritation, but in the event of a yeast infection, special cream is prescribed. Rhodes testified that G.M.'s records reflect that she

was seen by Dr. Soufan on December 15, 2015, for vaginal pain. Dr. Soufan noted that G.M. had a rash on her labia and diagnosed her with a skin yeast infection.

¶ 37    Rhodes testified that neither G.M.'s UTIs nor the redness in her private area caused her concern, at the time, that G.M. was being sexually abused.

¶ 38    Rhodes also testified that G.M. had problems with constipation since infancy. Rhodes initially prescribed dietary changes. When these changes were not successful, she prescribed oral medication, which was successful.

¶ 39    Krueger testified that she is a certified pediatric nurse practitioner and a member of the "MERIT" program ("Medical Evaluation Response Initiative Team") at the University of Illinois. Prior to her service with MERIT, Krueger spent several years in pediatric nursing practice. Krueger's duties with MERIT include physically examining children who are suspected victims of sexual abuse. Krueger examines more than 200 children per year. The trial court recognized Krueger as an expert in the area of child abuse.

¶ 40    Krueger testified that G.M. was referred to her from DCFS and CLCC. On August 7, 2015, Krueger met with G.M. and Johnson. As part of the exam, Krueger spoke with G.M. alone. G.M. was happy, playful, and relaxed. Krueger asked G.M. if she knew why she was seeing Krueger. G.M. responded that she was there because "her dad touched her pee-pee and it hurt sometimes when he did it." Her dad "told her that she would be in trouble if she told."

¶ 41    Krueger testified that, after speaking with G.M., she performed a complete medical examination. She found nothing abnormal with G.M.'s vaginal and anal areas.

¶ 42    Nonetheless, Krueger believed that G.M.'s case was highly suspicious for child sexual abuse. Krueger found support for G.M.'s allegations in two sources. The first was Johnson's report that G.M. frequently wet her bed, had nightmares, and woke up during the night. Krueger

did not elaborate on the significance of this information. The second source was G.M.'s medical history. Medical history, Krueger explained, is important in assessing the possibility of sexual abuse because "some things are just more common with abuse victims than with other children." For this source of data, Krueger consulted Johnson as well as G.M.'s medical records. Johnson reported that G.M. had a history of severe constipation starting when she was 18 months old. G.M. was treated with a laxative and enemas.

¶ 43    Krueger noted from G.M.'s medical records that her first reported episode of constipation was at 15 months of age. She experienced constipation "off and on through 2014." Krueger also noted from the records that, in a one-year period from 2013 to 2014, G.M. was brought on eight occasions to a physician (her primary-care provider or a quick-care clinic) because she complained of painful urination and had symptoms of vulvovaginitis, *i.e.*, inflammation or rash in the vaginal area. During this period, G.M. was also diagnosed with two UTIs. Additionally, G.M. was reported on three of the visits as having blood in her urine. In August 2014 alone, G.M. was seen multiple times. In addition to the eight visits, there were times when Johnson called a physician and reported that G.M. had redness. Krueger believed that, "[f]rom 2014 on [G.M.] was doing well," or least there were no records of visits between August 14, 2014 and July 18, 2015. The July 18 visit was two days after G.M.'s alleged report to Johnson that defendant was touching her. On December 15, 2015, G.M. saw Soufan after complaining of vaginal pain for a week. She had a rash on her labia and was diagnosed with a skin yeast infection.

¶ 44    Krueger acknowledged that hygiene problems are the typical cause of vulvovaginitis in children of G.M.'s age group (three to five years old). Poor hygiene may also lead to UTIs. However, Krueger suggested that, if hygiene problems were the cause of G.M.'s recurring episodes of vulvovaginitis, one would expect to see more children in her age group with such recurring

conditions, since such children are usually not as careful to clean themselves after using the bathroom.  In truth, however, such children typically have one or two episodes of vulvovaginitis, in contrast to G.M.'s eight documented episodes of vulvovaginitis in a single year as well as phone consultations with a physician in which Johnson reported that G.M. had redness.  Another reason Krueger believed that hygiene was less likely the cause of G.M.'s conditions was that, on multiple occasions, the adult who brought G.M. to the care provider was advised about hygiene.  Krueger also found it significant that G.M. had blood in her urine, which is "really never normal in a prepubescent child."  Krueger further noted that, customarily, a child with one or two UTIs is referred for an ultrasound to determine if there is a bladder or kidney problem causing the infections.  In this case, G.M. was not given an ultrasound.

¶ 45    In Krueger's view, sexual abuse was not ruled out by the lack of any abnormality during G.M.'s physical exam.  In 95 percent of the cases referred to Krueger for suspected abuse, the child's exam is normal.  The reason is that vaginal and rectal injuries heal within days.  Therefore, according to Krueger, it was probable that any injuries G.M. suffered from the abuse had healed between July 16, 2015—the date of G.M.'s alleged report—and Krueger's exam on August 7, 2015.  Krueger also noted that an insertion into the vagina may leave no injury at all because vaginal tissue is pliable.  As for G.M.'s December 2015 doctor visit in which she was diagnosed with a yeast infection, Krueger found it significant that this was apparently G.M.'s first doctor visit since July 2015, which was the last month in which defendant saw G.M.

¶ 46    After Krueger testified, the State rested.  The defense made a motion for a directed verdict, which the trial court denied.

¶ 47    The defense called Debra Stonewall, Debra Cannon, and defendant.  Stonewall, defendant's mother, testified that, in 2011, defendant moved into the Rockford home that

13

Stonewall shared with defendant's stepfather. Subsequently, a care arrangement for G.M. was established. Johnson would drop off G.M. in the morning at the Stonewalls' home. Stonewall would watch G.M. before leaving for her first-shift job. Care duties then switched to defendant, who watched G.M. until he needed to leave for his second-shift job. Defendant would then transport G.M. to one of his sisters' homes. In addition to watching G.M. on weekdays, defendant would watch G.M. every other weekend.

¶ 48 Stonewall testified that G.M.'s toilet training began when she was about two years old. From the beginning of that training until at least July 2015, G.M. needed reminding to wipe herself and flush the toilet. Once G.M. learned that she had to wipe, she needed assistance in the bathroom only when she had a messy bowel movement and could not clean herself properly.

¶ 49 Stonewall stated that G.M. loved and looked up to defendant. They would watch movies together at home. G.M. never appeared afraid of defendant. Stonewall recalled no instance since G.M.'s birth when defendant was arrested and broke out of jail. Nor did she recall defendant wearing a cast or calling 911 on G.M. The Stonewalls currently have two dogs. A third dog, named Dexter, had died.

¶ 50 Stonewall testified that, on July 18, 2015, there was a family meeting at the Stonewalls' home. Present at the meeting were Stonewall, Johnson, Debra Cannon (defendant's sister), and defendant. On this occasion, G.M. did not appear afraid of defendant but gave him a hug before she left.

¶ 51 Cannon, defendant's sister, testified that she provided daycare for G.M. for all of 2014 and into July 2015. At the time, Cannon offered daycare for family and friends and the teachers at her daughter's school. Cannon watched G.M. on weekdays. Defendant would drop off G.M. between 12:30 and 1 p.m., and Johnson would pick up G.M. between 5 and 5:30 p.m.

¶ 52   Cannon testified that G.M. was potty-trained when she began daycare with Cannon. During the entire time that Cannon watched G.M., she had to remind her to flush the toilet and wipe herself.  At times, G.M. needed help wiping herself.

¶ 53   Cannon had opportunities, other than when defendant was dropping off G.M., to observe how the two interacted with each other.  Defendant and G.M. had a normal father-daughter relationship.  On July 18, 2015, there was a family meeting at the Stonewalls' home.  During the meeting, G.M. went over to defendant, sat on his lap, and talked to him.  When Johnson told G.M. she had to leave, she became upset because she wanted to stay.

¶ 54   Cannon could recall no time since G.M.'s birth when defendant was arrested and broke out of jail.  Nor could she recall defendant calling 911 on G.M. or defendant wearing a cast.  Cannon never saw defendant touch G.M. in a sexual way, and she never called the police because of any interaction between defendant and G.M.

¶ 55   Defendant testified that he began dating Johnson in 2005.  They broke up in 2011 or 2012 but continued a sporadic relationship.  In 2012, defendant took Johnson to court over custody and visitation.  Through mediation in 2012, a custody and visitation schedule was established. Defendant's description of the weekday care arrangement was consistent with Stonewall's and Cannon's testimony on that subject.  On weekday mornings when defendant watched G.M., he made her breakfast.  She then played with toys, watched cartoons, or rode her bike.  In addition to weekdays, defendant had visitation with G.M. every other weekend.  G.M. loved him; they liked to play and joke around.  He would speak to her in a funny voice.

¶ 56   Defendant changed G.M.'s diapers before she started using the toilet.  Once G.M. began toilet training, she needed to be reminded to wipe.  G.M.'s problems with wiping were discussed with defendant and Johnson during doctor visits.  Occasionally, G.M. would need help wiping

herself, and defendant or another family member would help her. G.M.'s need for help with wiping continued through July 2015. When defendant wiped G.M., he touched her in a parenting way, not a sexual way.

¶ 57    Defendant testified that G.M. had constipation since around the age of two. She took a laxative for about two years. G.M. also had problems with redness on her vagina and pain when urinating. G.M. would see a physician repeatedly for these problems. Defendant would take her to some of these appointments. Rhodes recommended a vaginal cream for G.M. Defendant was not one who applied the cream.

¶ 58    When G.M. was at defendant's house on weekends, she would bathe rather than shower. When G.M. was a baby, defendant would wash her including her vaginal area. He touched her in a parenting way, not a sexual way. When G.M. was older, she bathed alone. Defendant would run the water and put toys in. G.M. would sit in the tub alone. Defendant would wash her hair and make sure she washed her body. Defendant left the door open or remained nearby while G.M. washed. Defendant denied showering with G.M. According to defendant, he and G.M. referred to a vagina as a "coo-coo" and a penis as a "wiener."

¶ 59    Defendant testified that his sporadic relationship with Johnson continued into July 2015. He spent "family" time with Johnson and G.M. He and Johnson got along for the most part. Defendant contradicted Johnson's testimony that he was upset with Johnson's plan to enroll G.M. in school in the fall of 2015. Defendant testified that he had no issue with G.M. being in school. In fact, it was defendant who enrolled G.M. in Pre-K, which she attended for two months before defendant and Johnson got into an argument and Johnson withdrew G.M. from the program.

¶ 60    Defendant testified that, on the weekend before July 16, 2015, he and Johnson argued. He had been "starting to get fearful of where [his] daughter was at." He threatened to take Johnson

back to court and seek full custody of G.M. Defendant testified his sister was the one who informed him of G.M.'s allegations. On July 18, 2015, defendant was at the Stonewalls' house with his sister, Stonewall, Johnson, and G.M. On that occasion, G.M. showed no fear of defendant and acted like she was playing a game. Before leaving the house, G.M. gave defendant a hug. Defendant testified that July 18, 2015, was the last day he saw G.M. before she testified in this case.

¶ 61 Defendant denied sexually abusing G.M. at any time. Since G.M. was born, he has not been arrested and broken out of jail, nor has he told G.M. a story to that effect. He also has not worn a cast since G.M. was born. He has not called or threatened to call 911 on G.M., and Cannon has not called the police on him.

¶ 62 After defendant's testimony, the parties and the court discussed jury instructions. Following this discussion, defense counsel informed the court that she had a handwritten stipulation to present. The stipulation, which was read to the jury, stated:

> "The parties hereby stipulate that if called to testify Linda Langjans would testify that
>
>> 1. On June 13, 2017, [G.M.] told [Assistant State's Attorney] Jenny Clifford and Linda Langjans that her dad only touched her private [*sic*] two times in the bathroom of his house to put medicine on her vagina.
>>
>> 2. On July 17, 2017, [G.M.] told Jenny Clifford and Linda Langjans that she never saw her dad's penis, never touched her dad's penis, and her dad never helped her in the shower."

¶ 63 Following the stipulation, the defense rested. In closing argument, defense counsel again stressed that G.M.'s statements were inconsistent and "outlandish."

¶ 64    During deliberations, the jury asked to see the stipulation. Rather than provide the jury with the stipulation, the court called the jury in and read the stipulation again.

¶ 65    The jury found defendant guilty on all three counts. Defendant retained new counsel and filed a posttrial motion. Defendant raised arguments regarding jury selection, evidentiary rulings, and the sufficiency of the evidence. Defendant did not allege that his trial attorney provided ineffective assistance.

¶ 66    Following a hearing, the court denied defendant's posttrial motion. The court sentenced defendant to 7 years of imprisonment on each of counts 1 (placing finger on G.M.'s vagina) and 2 (placing penis on G.M.'s anus), and to 6 years of imprisonment on count III (placing G.M.'s hand on his penis). The court ran the terms consecutively.

¶ 67    Defendant filed this timely appeal.

¶ 68                                  II. ANALYSIS

¶ 69    Defendant contends on appeal that (1) his trial attorney provided ineffective assistance of counsel for failing to make a pretrial challenge to G.M.'s competency as a witness, and for failing to present an expert witness at trial; and (2) the evidence at trial was insufficient to support his convictions.

¶ 70                      A. Ineffective Assistance of Counsel

¶ 71    A criminal defendant has a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A claim alleging ineffective assistance of counsel is governed by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting the *Strickland* standards for ineffectiveness claims in Illinois courts). To succeed on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was

deficient and that the deficiency prejudiced the defendant. *Strickland*, 466 U.S. at 687. Counsel's performance was deficient if it fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687-88. Prejudice exists only if, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A defendant must establish both prongs of the *Strickland* test in order to prevail. *People v. Veach*, 2017 IL 120649, ¶ 30.

¶ 72    The State argues that defendant forfeited his claims of ineffectiveness because he did not raise them in his posttrial motion, which defendant filed after retaining new counsel. Generally, a defendant forfeits an issue for appeal if he does not raise it both at trial and in a written posttrial motion. *People v. Cregan*, 2014 IL 113600, ¶ 15 (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Arguing against forfeiture, defendant relies on the supreme court's citation in *Cregan* to the exceptions that the court made in *Enoch* to the forfeiture rule:

> "In *Enoch*, *** this court held three types of claims are not subject to forfeiture for failing to file a posttrial motion: (1) constitutional issues that were *properly raised at trial* and may be raised later in a postconviction petition; (2) challenges to the sufficiency of the evidence; and (3) plain errors.
>
>      ***
>
> *** [T]he constitutional-issue exception recognized in *Enoch* is based primarily in the interest of judicial economy. The Post–Conviction Hearing Act provides a mechanism for criminal defendants to assert that a conviction or sentence resulted from a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a) (West 2008). Postconviction proceedings permit inquiry into constitutional issues that were not, and could not have been, adjudicated on direct appeal. *People v. English*, 2013 IL 112890, ¶ 22. If a defendant were precluded from raising a

constitutional issue previously raised at trial on direct appeal, merely because he failed to raise it in a posttrial motion, the defendant could simply allege the issue in a later postconviction petition. Accordingly, the interests in judicial economy favor addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition." (Emphasis added.) *Id.* ¶¶ 16, 18.

¶ 73 As we read the court's analysis, *Cregan* simply reaffirmed exceptions that were plainly articulated in *Enoch* and did not add any substance to them. See *Enoch*, 122 Ill. 2d at 190 ("[W]hen the defendant fails to comply with the statutory requirement to file a post-trial motion, our review will be limited to constitutional issues which have properly been raised at trial and which can be raised later in a post-conviction hearing petition [citation], sufficiency of the evidence, and plain error."). Consequently, it is proper for us to consult how courts have dealt since *Enoch* with ineffectiveness claims that are raised for the first time on appeal. Notably, though ineffectiveness claims are indeed constitutional claims, the practice of courts since *Enoch* shows an unwillingness to apply the constitutional-claim exception to ineffectiveness claims (indeed, the exception seems somewhat ill-fitting since ineffectiveness claims are not practicably raised *at trial* except through the process provided in *People v. Krankel*, 102 Ill. 2d 181 (1984)). Rather, courts enforce forfeiture where the defendant neglected to raise ineffectiveness in his posttrial motion—provided that the defendant was *pro se* or represented by new counsel in posttrial proceedings, as "[a]n attorney cannot be expected to argue his own ineffectiveness" (*People v. Lawton*, 212 Ill. 2d 285, 296 (2004)). "[T]rial counsel's failure to assert his own ineffective representation in a posttrial motion does not waive the issue on appeal." *Id.* The implication in the foregoing remark from *Lawton* is that forfeiture does apply where the defendant in posttrial proceedings was *pro se* or represented by new counsel. Indeed, courts have found forfeiture of ineffectiveness claims where

raising them in a posttrial motion would not have been a conflict of interest for counsel. See, *e.g.*, *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 136 (new counsel); *People v. Salgado*, 366 Ill. App. 3d 596, 607 (2006) (same); *People v. Ramos*, 339 Ill. App. 3d 891, 899-900 (2003) (same). Under these precedents, forfeiture would appear to apply here because defendant's posttrial motion was prepared by new counsel.

¶ 74     When asked at oral argument about forfeiture, defense counsel submitted that posttrial counsel was himself ineffective for failing to argue his predecessor's ineffectiveness. Even if we overlooked—by whatever means—the forfeiture and addressed the underlying claims that trial counsel was ineffective, we would find them lacking merit. Defendant complains that his trial counsel, for all her attacks on the plausibility of G.M.'s account, did not take action to bar G.M. as a witness or to call an expert at trial to rebut Krueger's testimony.

¶ 75     Defendant's first claim of ineffectiveness is that his trial counsel should have sought a hearing on G.M.'s competency as a witness. Defendant criticizes trial counsel for characterizing G.M.'s prior statements as "bizarre" and inconsistent without bringing a pretrial challenge to her competency. Defendant asserts that, if trial counsel had sought a competency hearing, or at least reminded the trial court of its earlier promise to *voir dire* G.M. on her competency, "[p]erhaps the *** court would have discerned that G.M. was not a competent witness." Defendant adds no argument to this assertion. He cites three cases—*People v. Harris*, 389 Ill. App. 3d 107 (2009), *People v. Cookson*, 335 Ill. App. 3d 786 (2002), and *People v. Sutherland*, 317 Ill. App. 3d 1117 (2000)—that he claims apply the standards for witness competency in section 115-14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-14 (West 2016)). Defendant, however, fails to set forth those standards. He also neglects to attempt any factual comparison between the foregoing cases and the case at hand. Thus, while defendant makes some reference to statutory

21

and decisional authority, he fails to apply it to the facts in this case. It is not our place to conjure an argument for defendant's benefit. See *People v. Olsson*, 2014 IL App (2d) 131217, ¶ 16 (litigants may not foist onto the appellate court the burden of research and argument). Since defendant develops no argument under the governing law, his contention is forfeited and we do not consider it. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2017) (points without supporting argument are forfeited).

¶ 76    Defendant's second claim of ineffectiveness is that trial counsel should have presented an expert witness to rebut Krueger's testimony. The State argues that the record as its stands is inadequate for reviewing this particular ineffectiveness claim. We agree. "[I]neffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim." *Veach*, 2017 IL 120649, ¶ 46. "The reason is that in Illinois, defendants are required to raise ineffective assistance of counsel claims on direct review if apparent on the record." *Id.* However, "[o]ne of the problems with raising an ineffective-assistance claim on direct appeal is the 'appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose.' " *In re Ch. W.*, 399 Ill. App. 3d 825, 829 (2010) (quoting *Massaro v. United States*, 538 U.S. 500, 504-05 (2003)). "Another problem is the record likely does not reflect counsel's reasoning behind his or her actions or omissions, and thus the reviewing court may lack a 'way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse.' " *Id.* (quoting *Massaro*, 538 U.S. at 505). Whether the record on direct review is adequate to resolve a claim of ineffectiveness is a case-by-case inquiry. *Veach*, 2017 IL 120649, ¶ 48.

¶ 77    Defendant claims that "[t]he absence of even a single expert [called by the defense] smacks of ineffective assistance of counsel." Defendant cites several cases, but none are procedurally comparable, *i.e.*, in none of them was the reviewing court asked to determine if the record on direct review was adequate to decide whether trial counsel was ineffective for failing to present certain evidence. We agree with the State that we cannot resolve defendant's claim based on the current record, which is silent as to whom defendant believes trial counsel should have called as a witness, what sort of opinion the witness would offer, and what, if any, reasons trial counsel had for not calling such a witness. "For a reviewing court to engage in a meaningful review of whether failing to call an expert witness constituted ineffective assistance of counsel, the testimony of the expert would undoubtedly prove helpful to the disposition of the claim." *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 50 (direct appeal omitting ineffectiveness claim was not *res judicata* of postconviction ineffectiveness claim based on trial counsel's failure to present expert opinion on issue of victim's level of intoxication and ability to recall).

¶ 78    Defendant requests, in the event we find the record inadequate, that we retain jurisdiction of this case while remanding for an evidentiary hearing on his ineffectiveness claim. Defendant cites *Cregan*, but that case stands for no such relief. Since postconviction relief is available to defendant, we decline his request for a limited remand to develop his ineffectiveness claim. Compare *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 17 (declining defendant's request for a limited remand to pursue his ineffectiveness claim and distinguishing *People v. Fellers*, 2016 IL App (4th) 140486, ¶¶ 35-36, where a limited remand was granted since postconviction relief was unavailable to the defendant because he had completed his prison sentence).

¶ 79    Finally, we note that, in his reply brief, defendant raises an additional ineffectiveness claim relating to the stipulation presented by the parties. Since arguments raised for the first time in the

reply brief are forfeited (see Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2017)), we do not address this contention.

¶ 80                              B. Sufficiency of the Evidence

¶ 81    Defendant's second challenge on appeal is to the sufficiency of the evidence to convict him. Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 142. It is the province of the jury, as the trier of fact, to assess the credibility of the witnesses and the weight to be given their testimony, to resolve conflicts or inconsistencies in the evidence, and to draw reasonable inferences from the evidence. *Id.* On these matters, the reviewing court will not substitute its judgment for that of the trier of fact. *Id.* A criminal conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.*

¶ 82    Defendant asserts that "G.M.'s accounts of her interactions with [defendant] were, in large part, the imagined product of a five-year-old child's mind." Defendant claims that, "[b]y any measure, G.M.'s testimony was, at best, problematic," and that she had "a remarkable proclivity regarding changing her mind seemingly dependent upon what she recalled at any given moment."

¶ 83    Absent from defendant's evidentiary challenge is any claim that G.M.'s trial testimony was implausible in itself. Specifically, defendant's challenge is based not on any internal deficiencies in G.M.'s testimony but on its relationship to her prior statements. G.M.'s testimony, we note, was pertinent to count 1, which alleged that defendant placed his fingers on G.M.'s vagina. Specifically, G.M. testified to an occasion where defendant touched an area that he was not

24

supposed to touch. G.M. and defendant were in the bathroom at his house when he touched her "coo-coo," or vaginal area, with his finger. She could not recall if defendant's finger went into her "coo-coo." The touching "hurt a little bit but not too much, like getting your ears pierced." G.M. initially testified that she thought defendant "touched [her] two times more," but later she claimed that she did not recall defendant touching her "coo-coo" with his fingers at other times. She testified that, besides her "coo-coo," defendant did not touch any other part of her body that he should not touch. G.M. could not recall if she ever saw defendant's private area.

¶ 84 Significantly, G.M.'s account at trial had none of the aspects on account of which defendant attacks G.M.'s statements to Johnson and Tischman as the product of G.M.'s "imagination." However, we recognize that the prior statements to Johnson and Tischman were an essential part of the State's case at trial because they were the only evidence of an accusation by G.M. that defendant's finger not just made contact with her vagina but also intruded into it (count 1), that he placed his penis on her anus (count 2), and that he placed her hand on his penis (count 3). To prove "sexual penetration" per count 1, the State had to establish that defendant's finger intruded into G.M.'s vagina. See *People v. Guerrero*, 2016 IL App (2d) 160920, ¶¶ 6-8; 720 ILCS 5/11-1.40(a)(1) (West 2016) (elements of criminal sexual abuse of a child); 720 ILCS 5/11-0.1 (West 2016) (definition of "sexual penetration").

¶ 85 Defendant's challenge to G.M.'s credibility is based specifically on: (1) the far-fetched aspects of G.M.'s statements to Johnson and Tischman: (2) Johnson's testimony that G.M. recanted her allegations at some point between July 18, 2015, and October 17, 2016; (3) G.M.'s inability at trial to recall telling Johnson certain details about defendant's touching, or, at some point, telling Johnson that defendant did not, in fact, abuse her; (4) Langjan's stipulated testimony that G.M. told Clifford that (a) defendant only touched G.M.'s privates when applying medication,

(b) G.M. never touched or saw defendant's penis, and (c) defendant never helped her in the shower; and (5) G.M.'s testimony that she recalled making the foregoing statements to Clifford.

¶ 86    In reviewing these challenges, we bear in mind that "child witnesses, especially the very young, often lack the cognitive or language skills to effectively communicate instances of abuse at trial [citation] or may be impeded psychologically in their efforts to do so [citation]." *People v. Bowen*, 183 Ill. 2d 103, 115 (1998). "Children may be subject to memory loss in the often prolonged period between the abuse and trial[.]" *Id.* G.M. was five years old when she first reported to Johnson that defendant was touching her. She was seven years old when she testified at trial, where she recounted abuse that occurred when she was four or five years old.

¶ 87    Defendant identifies no deficiencies in G.M.'s account that would preclude any rational person from believing her. G.M.'s statements to Tischman and Johnson had some obviously implausible aspects, such as her claims about Dexter, 911 calls, and defendant's dealings with the police. However, the critical portions of her accusations had adequate assurances of reliability. On July 16, 2015, G.M. made an impromptu remark to Johnson that defendant had been touching her private area when she used the bathroom. According to G.M., defendant would touch her without toilet paper, lick his fingers, and then wash his hands. Defendant did this multiple times. When Rhodes saw G.M. two days later on July 18, G.M. gave a similar account of defendant's touching, but also claimed that defendant sometimes placed his hand inside her. Later that same day, G.M. made the impromptu remark to Johnson that defendant would run his finger from her "pee-pee," or vagina, to her butt. When G.M. was brought to Tischman on August 2, she volunteered, prior to any questioning, that defendant had been touching her "coo-coo," or vagina. G.M. then described several instances where defendant touched or penetrated her "coo-coo" with his finger. G.M. further reported to Tischman that defendant placed his penis on G.M.'s anus and,

in another instance, placed G.M.'s hand on his penis.  On August 7, G.M. reported to Krueger that defendant would touch her "pee-pee" and that sometimes the touching hurt her.  At trial two years later, G.M. was specifically asked about the improbable aspects of her prior statements.  She claimed virtually no memory of providing those details, but, critically, she affirmed that defendant had touched her privates.  The far-fetched details of G.M.'s statements were, ultimately, tangential to the substance of her allegations as she repeated them to various adults and, finally, at trial.

¶ 88    Defendant suggests that G.M.'s statements to Tischman have diminished value because Tischman "had an overriding personal agenda," which she displayed in failing to ask follow-up questions on the implausible aspects of G.M.'s statements.  Defendant can only speculate on how G.M. would have responded to such further questioning.  Moreover, even as they stood, G.M.'s statements to Tischman had substantial probative value, as we have determined.

¶ 89    We also recognize that, at trial, G.M. did not recall telling Johnson certain details about defendant's touching, such as that defendant would wipe her without toilet paper, lick his fingers, and then wash his hands.  Also at trial, G.M. stated that she did not recall seeing defendant's "private," and she denied that defendant touched her on any private area on her body other than her "coo-coo."  As noted, children of G.M.'s age may be subject to memory loss between the abuse and the time of trial.  See *Bowen*, 183 Ill. 2d at 115.  G.M.'s memory failures were an issue for the trier of fact to consider in weighing her credibility.

¶ 90    We also note that G.M. did in fact recall making statements to ASA Clifford that contradicted her statements to Tischman as to whether she saw or touched defendant's penis and whether defendant helped her in the shower.  She also recalled telling Clifford that defendant applied medication to her privates.  These points, as well as Johnson's testimony that G.M. retracted her accusation at some point, were within the province of the jury to weigh in assessing

27

G.M.'s credibility. See *In re S.B.*, 348 Ill. App. 3d 61, 66 (2004) (child's out-of-court retraction was but one factor to be considered in assessing the overall credibility of the child's accusation).

¶ 91    In reviewing the sufficiency of the evidence, we cannot overlook Krueger's expert testimony. Defendant called no expert of his own to rebut Krueger's opinion that G.M. was sexually abused (we addressed, *supra* ¶¶ 76-78, defendant's claim of ineffectiveness in relation to that omission). Defendant asserts, cavalierly, that it was "[n]o matter" to Krueger that her examination of G.M. was normal; she nevertheless opined that G.M. was sexually abused. Defendant neglects to mention the actual basis for Krueger's opinion: G.M.'s prior medical history, particularly her eight episodes of vulvovaginitis in a single year as well as additional reports of redness in the vaginal area. Defendant also does not acknowledge Krueger's testimony that, in 95 percent of cases of suspected child abuse, the child's physical exam is normal because vaginal and rectal injuries heal within days.

¶ 92    Defendant also observes that Krueger did not opine to a reasonable degree of medical or scientific certainty that G.M. was sexually abused. Krueger testified only that G.M.'s case was "highly suspicious" for sexual abuse. We presume that the jury accorded Krueger's opinion the appropriate weight. Her testimony, together with the remaining evidence, was sufficient to convict defendant on all charges.

¶ 93    Defendant relies on *People v. Schott*, 145 Ill. 2d 188 (1992), and *Guerrero* in support of his challenge to the sufficiency of the evidence.

¶ 94    We begin with *Guerrero*. In that case, as defendant notes, this court held that the State failed to prove that the defendant committed predatory criminal sexual assault of a child based on digital penetration of the victim's vagina (720 ILCS 5/12-14.1(a)(1) (West 2004)), where the victim's testimony, even when viewed in the light most favorable to the prosecution, "establishe[d]

only that defendant touched [the victim] in her vaginal area" and not that he actually penetrated her vagina. *Guerrero*, 2018 IL App (2d) 160920, ¶ 54.

¶ 95     Defendant fails in his attempt to draw a factual comparison between *Guerrero* and the present case. The issue in *Guerrero* ultimately concerned whether the victim's testimony, as it stood, established penetration or simple touching. Defendant's appeal in this case presents no such narrow question; the parties do not argue over the interpretation of G.M.'s testimony. Rather, defendant broadly challenges G.M.'s credibility as to whether there was any touching at all. For the reasons stated, we hold that a rational trier of fact could find G.M.'s accusations credible.

¶ 96     As for *Schott*, defendant directs us only to the supreme court's holding in that case that the victim "was impeached numerous times and her testimony was so fraught with inconsistencies and contradictions that we find her testimony so lacking in credibility that a reasonable doubt of defendant's guilt remains." 145 Ill. 2d at 206-07. Defendant makes no attempt to draw a factual comparison between this case and *Schott*. Nonetheless, we have reviewed *Schott* and consider it clearly distinguishable. In *Schott*, the defendant, the victim's stepfather, was convicted by a jury of aggravated indecent liberties with a child. The supreme court reversed the conviction because the victim's credibility was thoroughly undercut. First, the victim contradicted herself, or was impeached, as to when, where, and how often the defendant abused her, and as to other acts of sexual abuse that she claimed were committed by or against her. Second, the victim admitted to a judge that she had falsely accused her uncle of sexual abuse because she was angry at him. Third, the victim had a motive to lie because she wanted the defendant to leave the house where she was living. Fourth, the victim told several people at different times that her allegation against defendant were untrue. Fifth, the victim admitted that she " 'lie[d] a lot.' " *Id.* at 193, 206-09. G.M.'s credibility was not damaged nearly to the extent witnessed in *Schott*.

29

¶ 97    Based on the foregoing, we reject defendant's challenge to the sufficiency of the evidence.

¶ 98                                III. CONCLUSION

¶ 99    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 100   Affirmed.